UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

DAVID J. PALUH,

                                    **REPORT**
                        Plaintiff,           **and**
          v.                        **RECOMMENDATION**

HSBC BANK USA,                      **02-CV-850A(F)**

                        Defendant.

_____

APPEARANCES:        MORIARTY & DEE
                    Attorneys for Plaintiff
                    ROBERT B. MORIARTY, of Counsel
                    1109 Delaware Avenue
                    Buffalo, New York 14209

                    PHILLIPS LYTLE LLP
                    Attorneys for Defendant
                    JAMES R. GRASSO, of Counsel
                    3400 HSBC Center
                    Buffalo, New York 14203

## JURISDICTION

This action was referred to the undersigned by Honorable Richard J. Arcara on
February 5, 2003 for pretrial matters including report and recommendation on
dispositive motions.  The matter is presently before the court on Defendant's motion for
summary judgment (Doc. No. 19) filed February 11, 2004.

## BACKGROUND

Plaintiff, David J. Paluh, commenced this action alleging employment
discrimination against his former employer, HSBC Bank USA, in violation of Title I of
the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq*. ("the ADA"), and

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII").[1]  In

particular, Plaintiff alleges Defendant failed to cross-train, promote or otherwise provide

Plaintiff with the opportunity to be promoted or to work overtime, based on Plaintiff's

disability, *i.e.*, a hearing impairment.  Plaintiff further alleges his employment was

terminated on December 18, 2002 to retaliate against Plaintiff for filing an administrative

complaint regarding the alleged discrimination.

Defendant's answer was filed on January 31, 2003.  On September 22, 2003,

Defendant filed an amended answer pursuant to a stipulation and order filed that same

date.  On January 30, 2004, Plaintiff filed an Amended Complaint (Doc. No. 18)

("Amended Complaint").  Defendant's answer to the Amended Complaint was filed on

January 22, 2004 (Doc. No. 16).

On February 11, 2004, Defendant filed the instant motion seeking summary

judgment dismissing the action in its entirety or, alternatively, partial summary judgment

dismissing Plaintiff's claims for back and front pay and benefits because Plaintiff failed

to mitigate damages following his termination.  The motion is support by a Statement of

Facts (Doc. No. 20) ("Defendant's Fact Statement"), the Declarations of Susan Gilbert,

Assistant Vice President/Operations Manager for Defendant's Microfilm Research

Department ("MRD") (Doc. No. 21) ("Gilbert Declaration"), Frances Bucholtz, formerly

Second Shift Supervisor in the MRD (Doc. No. 22) ("Bucholtz Declaration"), Donna

---

[1] Although Plaintiff asserts his employment discrimination claims under both the ADA and Title VII, the Amended Complaint contains no substantive allegations of a Title VII claim, *i.e.*, unlawful employment action based on Plaintiff's "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  Accordingly, Defendant's motion for summary judgment addresses only Plaintiff's ADA claims and construes Plaintiff's reliance on Title VII as limited to its remedies incorporated into the ADA.  Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment (Doc. No. 26) at 2 n. 3.

Nalbach, formerly Manager of the MRD and currently Vice President for Global Resourcing (Doc. No. 23) ("Nalbach Declaration"), Laura Donohue, an Officer in Defendant's Human Resources Department (Doc. No. 24) ("Donohue Declaration"), and James R. Grasso, Esq. (Doc. No. 25) ("Grasso Affidavit"), and Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment (Doc. No. 26) ("Defendant's Memorandum").

On April 5, 2004, Plaintiff filed in opposition to Defendant's motion, a Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 30) ("Plaintiff's Response"), the Affidavit of David J. Paluh ("Plaintiff's Affidavit"), and Plaintiff's Statement of Disputed Facts Pursuant to Rule 56 ("Plaintiff's Disputed Fact Statement").  On April 6, 2004, Plaintiff filed a volume of exhibits (Doc. No. 31) ("Plaintiff's Exhs. __").  On April 16, 2004, Defendant filed in further support of summary judgment Defendant's Reply Memorandum of Law in Support of Its Motion for Summary Judgment (Doc. No. 32) ("Defendant's Reply"), the Declaration of Lynne Brock, an Item Processing Clerk in the Adjustments Department (Doc. No. 33) ("Brock Declaration"), and the Reply Declaration of James R. Grasso, Esq. (Doc. No. 34) ("Grasso Reply Declaration").  Oral argument was deemed unnecessary.

Based on the following, Defendant's motion for summary judgment should be GRANTED; alternatively, Defendant's request seeking dismissal of Plaintiff's claims for back and front pay and benefits should be GRANTED.

**FACTS**[2]

Plaintiff David J. Paluh ("Paluh") describes his disability as a permanent hearing loss in both ears since birth.  According to Paluh, he used to be able to hear some sounds without a hearing aid and uses a hearing aid in only one ear.  After leaving HSBC's employment, Paluh received new hearing aids for both ears, but the hearing aids were too strong and further damaged his hearing.  As a result, Paluh can no longer hear any sounds without the use of hearing aids in both ears.

On June 7, 1993, Paluh commenced employment at HSBC Bank USA ("HSBC" or "the Bank"), initially working part-time as a proof machine operator in the Proof Department until 1994 when Paluh began working the proof machine operator position full time.[3]  While working in the Proof Department, Paluh received several promotions, including a 1995 promotion to Advanced Proof Operator and a 1996 promotion to Senior Proof Operator.  In 1997, Paluh had to take a leave of absence from work for treatment of a carpal tunnel syndrome problem.  Upon returning to work later in 1997, Paluh was physically unable to process the number of requests required to be permitted to work at the Senior Proof Operator position and was demoted to Advanced Proof Operator.[4]  Between 1993 and 1997, Paluh's manager in the Proof Department was Darnell McCain ("McCain") who, according to Paluh, attempted to persuade Paluh to quit, tried to fire Paluh, and told Paluh he should not apply for any other positions within

---

[2] Taken from the pleadings and motion papers filed in this action.

[3] Paluh's job responsibilities as a proof machine operator in the Proof Department are not described in the record.

[4] The precise nature of Paluh's reduced processing capacity is not discussed in the record.

the Bank because Paluh was hearing impaired.  Plaintiff's Affidavit ¶ 23.

Later in 1997, Paluh was transferred to the Bank's Microfilm Research Department ("MRD") where he worked as an Item Processing Specialist 1, a position which was considered a promotion from Paluh's previous Advanced Proof Operator position.  Paluh worked on the second shift, *i.e.*, from 4:30 P.M. to 1:00 A.M., Mondays through Friday (technically, early Saturday mornings).   Paluh's primary job responsibilities as an Item Processing Specialist 1 consisted of retrieving records of canceled checks and other documents stored on microfilm.  Frances Bucholtz ("Bucholtz"), Paluh's co-worker since transferring to the MRD in 1997, became the MRD's second shift supervisor and Paluh's direct supervisor, in the Spring of 2001.

Linda Baker ("Baker") was the department manager when Paluh commenced working in MRD until March 2001 when Susan Gilbert ("Gilbert") became MRD manager.  In December 2001, Gilbert was temporarily reassigned to work on a project involving the shifting of HSBC's MRD operations to India.  Donna Nalbach ("Nalbach") was MRD manager from December 2001 until October 2002 when Gilbert returned from the India assignment.

When Gilbert became MRD manager in March 2001, a backlog estimated as several months of work had accumulated in the MRD which Gilbert intended to eliminate through mandatory and voluntary overtime of MRD employees and the temporary assignment of employees from other departments to MRD.  By the end of 2001, mandatory overtime was no longer needed and from that time any overtime had to be approved by Gilbert's boss, Steve Kline ("Kline").  An MRD policy provided that employees could not work overtime hours without a supervisor present, and that policy

remained in effect until the Fall of 2001 when Gilbert relaxed the policy to permit an employee to work overtime provided a supervisor or a "senior person," defined as "the employee designated by the shift supervisor as the supervisor's backup, was present." Plaintiff's Fact Statement ¶ 9.  When Kline approved overtime for second shift employees on Mondays, Tuesdays, Wednesdays and Thursdays, neither the second shift supervisor, Bucholtz, nor a senior employee had to stay as the third shift supervisor would be present.  As the third shift did not work on Fridays after the second shift, a second shift employee, like Paluh, thus could not work overtime on Friday unless either Bucholtz or a senior employee agreed to remain on duty to supervise overtime work.  Neither Bucholtz nor any senior employee, however, wished to work overtime on Fridays following the second shift and Paluh's requests for permission to work overtime on Fridays without supervision were therefore routinely refused.

HSBC has a policy of permitting employees to "cross-train" to gain knowledge of other jobs in different departments.  Defendant's Memorandum at 6-7 (citing Defendant's Fact Statement ¶¶ 14-15).  Employees seeking to cross-train must first request permission from their respective department manager, and the request must also be approved by the manager of the department where the job for which cross-training is sought is located.  Factors considered in deciding whether to grant a cross-training request include the workload and the number of employees absent in the department where the cross-training was requested, the availability of an employee to provide the cross-training, and the number of employees who have already cross-trained in the department.

Paluh desired to participate in the cross-training program offered at HSBC, in the

Adjustments Department and, over a two-year period, made weekly requests to Baker for cross-training in the Adjustments Department.  Paluh maintains that although other, non-disabled employees' requests for cross-training were granted, Paluh's were denied. Plaintiff's Affidavit ¶ 8.  Paluh further maintains that upon becoming MRD manager in Spring 2001, Gilbert held a staff meeting at which she advised the MRD employees of the cross-training opportunity and, following the meeting, Paluh requested permission to cross-train in the Adjustments Department, but that Gilbert responded Paluh could not cross-train because he was deaf.  Plaintiff's Affidavit ¶ 9.  In July 2001, Paluh filed a formal complaint with HSBC regarding the denial of his requests to cross-train.  *Id.* ¶ 10.

In contrast, Gilbert maintains that upon becoming MRD manager, she was advised that employees had been told they would be permitted to cross-train, but that the MRD work backlog required suspending all cross-training by MRD employees until the backlog was sufficiently reduced, which Gilbert estimated would not occur until Fall 2001.  Gilbert Declaration ¶ 12.  Gilbert further maintains that when Paluh requested permission to cross-train in the Adjustments Department, Gilbert advised that Paluh would be the first employee to be authorized for such cross-training after the MRD backlog was reduced.  *Id.*  It is undisputed that Paluh was permitted to cross-train in the Adjustments Department for two weeks in October 2001, yet Paluh maintains that he was only permitted to observe and did not receive "hands-on training" as other non-disabled employees had, *i.e.*, Paluh was not permitted to perform any actual work in the Adjustments Department in furtherance of his cross-training.  Paluh Affidavit ¶¶ 10-11.

While employed by HSBC, Paluh applied for several other positions within the bank including a Human Resources Specialist in the Human Resources Department in

March 1999, a Third Shift MRD Supervisor in April 1999, an Item Processing Specialist 1 in the Adjustments Department for which Paluh applied three times, most recently in April 1999, an Item Processing Specialist 2 in the Adjustments Department in February 2001, a Second Shift MRD Supervisor in the Spring of 2001, an MRD Sections Operations Manager in October 2001, an Home Banking Service Specialist in the Home Banking Department in December 2001, and an Item Processing Specialist 3 in the Adjustments Department in June 2002.  Paluh maintains that all of his applications were ignored in the Bank's Human Resources Department by McCain, who had been his manager in the Proof Department from 1993 until 1997 when McCain transferred to a position in Human Resources.  Plaintiff's Affidavit ¶ 22.  According to Paluh, he was never invited to interview nor offered any to the positions for which he had applied. Plaintiff's Affidavit ¶¶ 21, 24.  Paluh also claims that McCain refused to consider the applications Paluh submitted and failed to respond to some of Paluh's submissions because of his hearing impairment.  Plaintiff's Affidavit ¶ 24.

On July 3, 2001, Paluh filed a charge of employment discrimination based on disability with the Equal Employment Opportunity Commission ("the EEOC"), alleging HSBC failed to cross-train him and denied him the opportunity to work overtime. On September 13, 2002, the EEOC issued a Dismissal and Notice of Right to Sue letter, dismissing the charge on the basis that upon investigating the claim, the EEOC was unable to conclude that HSBC had discriminated against Paluh because of his disability.

As noted, in 2001, HSBC decided to relocate the bulk of the services provided by MRD to HSBC's India operations in January 2002 ("the transfer date").  Specifically,

prior to 2002, the MRD, a department within HSBC's Operations Division, was responsible for making a photographic image of all checks processed by the Bank, as well as other various bank documents, for storage on microfilm.  When a canceled check or another bank document was requested by a customer or another bank department, an MRD employee would retrieve the photographic record from the microfilm reels and make a paper copy.  Because HSBC maintains copies of cancelled checks and other items for six years, it was decided that records created for the six years before the transfer date would remain in Buffalo where requests for such information would also be processed, but that all microfilm records created by the MRD <u>after</u> the transfer date would be sent to India and requests for information relating to such records would be handled in India.  Accordingly, over time, India would be responsible for processing more of the MRD records requests.

In 2002, HSBC began implementing new digital imaging technology in digital images of cancelled checks and other documents are made with a digital camera for storage on a computer rather than on microfilm.  Once the digital images are stored on the computer, any bank employee or customer needing a copy of a canceled check or other bank document can directly access an image of such check or document through a computer in a matter of minutes, thus eliminating the need to contact the MRD for a microfilm search.

The combined transfer of MRD work to India and the implementation of digital imaging technology resulted in a reduction in workforce in the MRD to 30 employees from approximately 65 employees.  During the summer of 2002, Nalbach and her boss, Kline, reviewed each MRD employee's personnel file to decide which MRD employees

to retain and which to terminate.  Each MRD employee was assessed according to the same criteria used in assessing employees for their annual reviews, *i.e.*, (1) knowledge of work; (2) quantity of work; (3) quality of work; (4) intiative; (5) dependability; and (6) cooperation with others.  Additionally, Nalbach and Kline also considered each employee's growth potential within HSBC, defined as "their ability to make a contribution to the success of the MRD and HSBC."  Defendant's Fact Statement ¶ 29. Nalbach and Kline then met with each MRD employee individually and informed the employee whether or not the employee would be retained.  In November 2002, Paluh was advised that he was not being retained, and that his final day of employment within the MRD was December 18, 2002.  Two other hearing impaired MRD employees were retained.

MRD employees selected for termination were encouraged to apply to transfer to positions open elsewhere within the Bank and Nalbach worked with HSBC's Human Resources Department to identify available positions, arrange interviews and give recommendations.  A few weeks after being informed of his impending termination, Nalbach was advised by the Human Resources Department that an Inserter Operator position was available in the Inserting Services Department, and that the position would be offered to Paluh if he wanted it.  The parties dispute whether the Inserter Operator position would be a salary grade 8 position, matching the salary grade of Paluh's then Item Processing Specialist 1 position, or a salary grade 9 position, which would be a promotion for Paluh.  *Compare* Defendant's Fact Statement ¶ 37 (stating Nalbach advised Paluh that if he accepted the Inserter Operator job he would remain at salary grade 8 with the same salary as his MRD Item Processing Specialist 1 position), with

Plaintiff's Affidavit ¶¶ 26-27 (stating Nalbach advised Paluh the Inserter Operator job would be a promotion, which Paluh interpreted as indicating "the Inserting job to be at least grade nine.").

After being informed by Nalbach of this proposal, and prior to agreeing to accept the offered Inserter Operator position, Paluh requested a tour of the Inserting Services Department, which Nalbach arranged.  Upon touring the Inserting Services Department, however, Paluh learned the department's primary responsibility was sorting mail and the Inserting Services supervisor, Shevette Stafford ("Stafford"), in response to Paluh's inquiry, stated that no position within the department was a salary grade 9 or higher, but that most positions were salary grades 5 and 6 positions, supervisor positions were salary grade 7 positions, all lower than Paluh's current Item Processing Specialist 1 position which was a salary grade 8 position, and the department manager position was a salary grade 8 position.  As it was Paluh's understanding from Nalbach that if he refused to take another position offered within the Bank, he would be denied severance pay upon the termination of his employment, Paluh maintains that he asked Nalbach to confirm in writing that the Inserter Operator position would be a promotion for him, but that Nalbach refused.  Plaintiff's Affidavit ¶ 30.  According to Paluh, had the Inserter Operator job been a promotion, *i.e.*, a salary grade 9, he would have accepted the position and requested cross-training in preparation for an eventual transfer to another department.  Plaintiff's Affidavit ¶ 31.

HSBC maintains that only upon declining another position within the Bank at the same salary grade or higher does a terminated employee become ineligible for severance pay.  Plaintiff's Fact Statement ¶ 39.  Because Paluh declined the Inserter

Operator position, which Paluh maintains HSBC asserted was a salary grade 8 position, the same as Paluh's Item Processing Specialist 1 position, Paluh technically was not eligible for severance; however Nalbach arranged with the Bank's Human Resources Department for Paluh to receive severance despite his rejection of the offered position. Plaintiff's Fact Statement ¶ 39.

Paluh continued to work in the MRD Item Processing Specialist 1 position until December 18, 2002 when his employment with the Bank was terminated.  On January 22, 2003, Paluh filed a second employment discrimination charge with the EEOC, alleging his employment at HSBC had been terminated based on his disability and to retaliate against Paluh for filing the earlier EEOC charge, and that prior to his termination, he had been denied the opportunity to cross-train for other positions within the Bank.  On November 4, 2003, the EEOC issued a Dismissal and Notice of Right to Sue letter dismissing the charges on the basis that upon investigating the claim, the EEOC was unable to conclude that HSBC had discriminated against Paluh based on his disability or retaliated against Paluh based on his filing the earlier EEOC charge.

After his termination, Paluh received $ 6,000 in severance pay and 39 weeks of unemployment insurance benefits totaling $ 14,664.  Paluh, based upon the recommendation of his advisor at New York State's Vocational and Educational Services for Individuals with Disabilities ("VESID"), pursued further education a local community college to improve his chances of finding other employment.  Paluh also filed for Social Security Disability Insurance Benefits and, on March 14, 2003, the Social Security Administration found Paluh totally disabled as of December 18, 2002, and awarded him monthly disability benefits.  Paluh has not worked since December 18,

2002.

## **DISCUSSION**

1.    **Summary Judgment**

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991).  The court is required to construe the evidence in the light most favorable to the non-moving party.  *Tenenbaum v. Williams*, 193 F.3d 58, 593 (2d Cir. 1999) (citing *Anderson, supra*, at 255).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex, supra*, at 322; *see Anderson, supra*, at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  In assessing a record to determine whether there is genuine issue of material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought.  *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991).

"[W]here the nonmoving party will bear the burden of proof at trial on a

dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule [FRCP 56],' and Rule 56(e) therefore requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex, supra*, at 323-24 (1986) (quoting Fed.R.Civ.P. 56).  Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the non-moving party's case."  *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 164 F.3d 736, 742 (2d Cir. 1998).  Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor.  *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).

Although a summary judgment motion may be made with or without supporting affidavits, if affidavits are submitted, they "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(a).  Rule 56 further provides that

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed. R. Civ. P. 56(e).


"However, if the motion for summary judgment is not made and supported as provided

in Rule 56, the Rule does not impose on the party opposing summary judgment an

obligation to come forward with affidavits or other admissible evidence of his own." *St.*

*Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir. 2000) (reversing granting of summary

judgment in favor of defendant because defendant failed to allege factual basis for

assertions contained in defendant's affidavit such that plaintiff, as the party opposing

summary judgment, was not required to adduce evidence to defeat summary judgment

and the "self-serving" nature of plaintiff's affidavit statements went to the weight of the

statements, rather than to their admissibility).

Nevertheless, vague assertions supported only by self-serving statements in the

nonmoving party's affidavit are insufficient to defeat a properly supported summary

judgment motion. *Coniglio v. Highwood Services, Inc.*, 495 F.2d 1286, 1292 (2d Cir.),

*cert. denied*, 419 U.S. 1022 (1974). "The non-moving party may not rely on conclusory

assertions or unsubstantiated speculation [to defeat summary judgment]." *Scotto v.*

*Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). Rather, "the non-movant must produce

<u>specific</u> <u>facts</u> indicating that a genuine factual issue exists." *Wright v. Coughlin*, 132

F.3d 133, 137 (2d Cir. 1998) (underlining added). The ultimate inquiry on a summary

judgment motion is whether any reasonable jury could find the plaintiff's evidence

meets the requisite burden of proof. *Amnesty America v. Town of West Hartford*, 361

F.3d 113, 122-23 (2d Cir. 2004).

In the instant case, HSBC seeks summary judgment dismissing the action in its

entirety on the basis that Paluh is unable to establish that he was subjected to any adverse action materially affecting the conditions of his employment on the basis of his hearing impairment.  Defendant's Memorandum at 2.  Alternatively, HSBC seeks partial summary judgment dismissing Paluh's claims for back and front pay and benefits on the basis that Paluh failed to mitigate his damages by not attempting to find comparable employment following his termination. *Id*.  Paluh argues in opposition that the existence of genuine issues of material fact bar summary judgment as to all causes of action. Plaintiff's Response at 1.  Defendant asserts in further support of summary judgment that Plaintiff has made only conclusory and unsupported allegations which are insufficient to defeat summary judgment.  Defendant's Reply at 1.


**2.     Disability-based Employment Discrimination**

"The ADA prohibits discrimination by covered entities, including private employers, against qualified individuals with a disability.  Specifically, it provides that no covered employer 'shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . [the] discharge of employees. . . . .'"  *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 477-48 (1999) (quoting 42 U.S.C. § 12112(a)).

To establish a *prima facie* case of discrimination under the ADA, the plaintiff must establish by a preponderance of the evidence that (1) his employer is subject to the ADA; (2) he suffers from a disability within the meaning of the ADA;[5] (3) he was

---

[5] "Disability" is defined under the ADA as:
(A) a physical or mental impairment that substantially limits one or more of the major life activities

otherwise qualified to perform the essential functions of the job with or without a reasonable accommodation; and (4) he suffered an adverse employment action based on his disability.  *Reeves v. Johnson Controls World Services, Inc.*, 140 F.3d 144, 149-50 (2d Cir. 1998) (citing *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869-70 (2d Cir. 1998)).  *See Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (describing the four elements as (1) membership in a protected class; (2) satisfactory job performance; (3) discharge from employment; (4) discharge occurred under circumstances giving rise to an inference of discrimination).  The plaintiff's burden of establishing a *prima facie* case of employment discrimination is *de minimus*. *Chambers*, *supra*, at 37.

In the instant case, Defendant concedes for the purpose of Defendant's summary judgment motion that the first three elements necessary to establish a *prima facie* case of discrimination under the ADA have been met.  *See* Defendant's Memorandum at 2 n. 1.  Accordingly, in considering whether Paluh has met his *de minimus* burden of establishing a *prima facie* case of employment discrimination based on disability, the court need consider only the fourth element.  Circumstances held to have given rise to the necessary inference of discrimination to establish the fourth element of a *prima facie* employment discrimination include (1) the employer sought to replace a discharged plaintiff with another person possessing the same qualifications,

---

of [an] individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

although not a member of the same protected class as the plaintiff, (2) the employer criticized the plaintiff's work performance in terms degrading to the protected class; (3) the employer made invidious comments about others in the plaintiff's protected class; (4) the employer treated more favorably employees not in the protected class; (5) the sequence of events leading to the adverse employment action; and (6) the timing of the adverse employment action.  *Chambers*, *supra*, at 37 (citing cases).

Further, in analyzing a discriminatory discharge claim under the ADA, courts employ the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  *Heyman v. Queens Village Committee for Mental Health for Jamaica Community Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999).  Under the *McDonnell Douglas* burden-shifting test, the plaintiff bears the initial burden of proving, by a preponderance of the evidence, a *prima facie* case of discrimination.  *Chambers*, *supra*, at 37.  *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993) ("Under the *McDonnell Douglas* scheme, '[e]stablishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee.'") (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).

The burden then shifts to the defendant to prove through admissible evidence a legitimate, non-discriminatory reason for their actions sufficient to support a finding by the trier of fact that unlawful discrimination was not the reason for the disputed employment action.  *Chambers*, *surpa,* at 38.  *See St. Mary's Honor Center*, *supra*, at 506-07 (establishing a *prima facie* case or "presumption" of employment discrimination produces the required conclusion of employment discrimination, absent an explanation

18

by the defendant rebutting the *prima facie* case with evidence that the adverse

employment action was taken for a legitimate, nondiscriminatory reason).

Nevertheless, the ultimate burden of production rests with the plaintiff who is then

required to show that the proffered reason was merely a pretext for the alleged

discrimination which "may be demonstrated either by the presentation of additional

evidence showing that the employer's proffered explanation is unworthy of credence, or

by reliance on the evidence comprising the *prima facie* case, without more." *Chambers*,

*supra*, at 38 (citing *St. Mary's Honor Center*, *supra*, at 507).

   Summary judgment may be the appropriate vehicle for resolving even a "fact-

intensive" employment discrimination case. *Abdu-Brisson v. Delta Air Lines, Inc.*, 239

F.3d 456, 466 (2d Cir. 2001). Although the court must be "especially cautious" in

deciding a summary judgment motion in an employment discrimination case given that

the employer's intent is often at issue and must be carefully scrutinized to reveal

circumstantial evidence supporting an inference of discrimination, *Belfi v. Prendergast*,

191 F.3d 129, 135 (2d Cir. 1999), a plaintiff opposing summary judgment cannot rely on

mere "conjecture or surmise, and must do more than simply show that there is some

metaphysical doubt as to the material facts." *Heilweil v. Mount Sanai Hosp.*, 32 F.3d

718, 723 (2d Cir. 1994) (internal quotes omitted). As such, "the salutary purposes of

summary judgment - - avoiding protracted, expensive and harassing trials - - apply no

less to discrimination cases than to commercial or other areas of litigation." *Meire v.*

*Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

   Here, Paluh asserts HSBC discriminated against him by denying Paluh the

opportunity to work overtime without supervision, denying Paluh's requests for cross-

training, failing to promote Paluh, and terminating his employment based on Paluh's hearing impairment, and also retaliated against Paluh for filing the earlier EEOC employment discrimination claim.

### 3.   Failure to Cross-Train

Paluh claims he was denied the opportunity to cross-train because of his disability and that when he eventually was permitted to cross-train, the quality of training he received was less than that received by non-disabled employees.  Paluh Affidavit ¶¶ 7-12.  HSBC maintains that Paluh cannot establish a *prima facie* case of employment discrimination based on HSBC's alleged failure to permit Paluh to cross-train for another job in another department because Paluh cannot show that he was denied such opportunity under circumstances giving rise to an inference of discrimination. Defendant's Memorandum at 6.  According to HSBC, when Paluh first requested cross-training in April 2001 from Gilbert, Gilbert advised that there would be no cross-training until the MRD work backlog was sufficiently reduced, but that Paluh would be the first employee permitted to cross-train after the backlog reduction occurred.  Defendant's Memorandum at 7.  Further, not only was Paluh the first MRD employee sent for cross-training in October 2001, *i.e.*, after the backlog was reduced, and as Gilbert had represented to Paluh, but Paluh was the only MRD employee Gilbert permitted to cross-train prior to her temporary reassignment to India in December 2001.[6]  *Id*. at 7-8.  HSBC

---

[6] Another MRD employee, Stacy Wildt ("Wildt"), who is also hearing impaired, was scheduled for cross-training in November 2001, but the training was postponed to early 2002 when Wildt became ill. Defendant's Memorandum at 8; Nalbach Declaration ¶ 8.

further maintains that even if Paluh has established a *prima facie* case for employment discrimination based on failure to permit Paluh to cross-train, the Bank has articulated a legitimate explanation for denying Paluh's requests and Paluh cannot establish that such explanation is a pretext for discrimination. *Id*. at 8-9.

Paluh also claims HSBC repeatedly denied his requests for permission to cross-train for a position in the Adjustment Departments.  Paluh alleges for the first time, in opposition to summary judgment, that upon transferring to MRD, he regularly asked then MRD manager Baker for permission to cross-train.  Plaintiff's Response at 9. According to Paluh, after Gilbert replaced Baker as MRD manager, he continued to regularly and repeatedly request cross-training, but was routinely denied, although other, non-disabled employees, received cross-training.  *Id*.  Plaintiff further maintains that some non-disabled employees received promotions based on their cross-training experience.  *Id*.  Finally, Plaintiff claims that when he was eventually permitted to attend cross-training in the Adjustments Department, his cross-training experience was different than that experienced by other employees who cross-trained in the same department.  *Id*. at 9.  For example, Paluh maintains that whereas other cross-training employees were permitted to perform some of the actual work for the job for which they were being cross-trained, which is consistent with the Bank's definition of cross-training as including "'observing and working alongside an employee in a different position in another department,'" Plaintiff's Response at 9 (quoting Defendant's Fact Statement ¶ 14), Paluh was only permitted to observe for the entire two-week period he cross-trained in the Adjustments Department and that, according to Paluh, he was told by the Adjustments Department trainer, Lynne Brock ("Brock"), that the Adjustments

Department manager, Linda Palumbo ("Palumbo"), did not want Paluh in the Adjustments Department because he was deaf.  Plaintiff's Response at 9-10.  Paluh maintains these circumstances raise an inference of discrimination based on disability, *id*. at 10, yet Paluh does not point to any evidence supporting these assertions.

HSBC replies in further support of summary judgment that no admissible evidence in the record establishes Paluh was treated any differently than any other non-disabled employees with regard to cross-training, and that Paluh has failed to identify any nondisabled MRD employee who was permitted to cross-train while Paluh's own requests to cross-train were denied.  Defendant's Reply at 1.  HSBC also objects to Paluh's belated assertion that prior to Gilbert's assignment as MRD manager, he requested permission to cross-train from Baker, given that such claim is not asserted in the Amended Complaint.  *Id*. at 2.  According to HSBC, it is not possible that Gilbert treated Paluh differently than other employees with regard to cross-training assignments as Paluh was the only MRD employee Gilbert permitted to cross-train prior to Paluh's termination.  *Id*.  Further, the undisputed evidence establishes that Nalbach permitted another hearing impaired employee, Wildt, to cross-train in early 2002.  *Id*. HSBC also relies on the affidavit of Lynne Brock who cross-trained Paluh in the Adjustments Department, and who explains that she treated Paluh the same as other cross-training employees, and further challenges the statements Paluh attributes to Palumbo as inadmissible hearsay which is insufficient to defeat summary judgment. *Id*. at 3.

A thorough review of the record establishes that Paluh has failed to prove, by a preponderance of the admissible evidence, a *prima facie* case for disability-based

employment discrimination related to the denial of Paluh's request for cross-training.  In particular, despite asserting that he observed other non-disabled MRD employees' requests for cross-training being granted, and that such employees who participated in the cross-training later received promotions as a result of the cross-training, Plaintiff's Response at 9, Paluh fails to name or to otherwise identify even one other MRD employee who was permitted, either by Baker, Gilbert, or Nalbach, to cross-train, when Paluh's own requests to cross-train were denied.  Nor does Paluh dispute HSBC's assertion, Defendant's Memorandum at 7-8, that Wildt, who was also allowed to cross-train in the Adjustments Department in early 2002, several months after Paluh had been permitted to cross-train in that same department, is also hearing impaired.  In fact, contrary to Paluh's allegations, the record suggests that only hearing impaired MRD employees were permitted to cross-train in the Adjustments Department.

Paluh's assertion regarding the quality of cross-training he eventually received from Brock in the Adjustments Department also fails to raise an inference of discrimination.  Paluh maintains that his cross-training consisted only of observing Brock, unlike other nondisabled employees who also cross-trained in the Adjustments Department who were permitted both to observe and work alongside Brock at the jobs for which they were being cross-trained, and that Brock told Paluh that he would only be permitted to observe because the Adjustments Department manager, Palumbo, did not want Paluh working in the Adjustments Department because of Paluh's hearing impairment.  Plaintiff's Response at 9-10.  The evidence on which Paluh relies, however, is inadmissible hearsay, specifically, the statement Paluh alleges was made by Brock and attributed to Palumbo and offered for the truth of the matter asserted.

23

Fed.R.Evid. 801(c); *Evans v. Port Authority of New York and New Jersey*, 192

F.Supp.2d 247, 262-64 (S.D.N.Y. 2002) (holding, in context of employment

discrimination action, that co-worker's statement regarding supervisor's alleged

statement, offered by plaintiff for the truth of the matter asserted, was inadmissible

hearsay and, thus, insufficient to defeat summary judgment).  *See Burlington Coat*

*Factory Warehouse Corp. v. Esprit de Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) (party

opposing summary judgment cannot rely on inadmissible hearsay evidence to defeat

motion, absent showing that admissible evidence will be available for trial).

Accordingly, Paluh has failed to meet the initial burden of proving, by a preponderance

of the evidence, a *prima facie* case of discrimination based on HSBC's alleged failure to

properly cross-train him because of his hearing impairment.  *Chambers*, *supra*, at 37.

As to Paluh's belated assertion that he initially requested and was denied

permission to cross-train from Baker, Paluh does not specify in which department he

desired to cross-train.  Nor does Paluh state the reason why Baker denied his alleged

requests, which Paluh stated at his deposition he made weekly.  Paluh Deposition T. at

43.  Further, although Paluh also testified at his deposition that "most" of the other, non-

disabled MRD employees received cross-training and, if they liked the job for which

they cross-trained, often were promoted to such job, Paluh was unable to recall the

name of even one such individual whom he claims received cross-training while his own

requests were denied.  Paluh Deposition T. at 43.  Nor has Paluh submitted an affidavit,

either from a former HSBC co-worker who received such cross-training during the

period in which Paluh's requests for cross-training were denied, or from any other co-

worker who observed that other, non-disabled employees were permitted to cross-train

while Paluh was not.

Moreover, even if Paluh's failure to cross-train claim has established a *prima facie* case of disability based employment discrimination so as to shift the burden to HSBC, HSBC has articulated a legitimate explanation, corroborated by admissible evidence, for the denial of Paluh's requests for cross-training, which Paluh has failed to rebut as merely a pretext for the alleged discrimination.  Specifically, HSBC explained that cross-training for MRD employees was temporarily suspended during 2001 until the backlog of work in the MRD was significantly reduced, which Paluh does not deny, nor has Paluh proffered anything establishing such explanation was merely a pretext to employment discrimination.  That Paluh was the first MRD employee permitted to cross-train once the MRD work backlog was reduced in November 2001 is consistent with the reason Gilbert gave for denying Paluh's cross-training requests.

Furthermore, as to Paluh's assertion that the cross-training he eventually received in the Adjustment Department was less than that received by non-disabled employees who also cross-trained in the Adjustments Department, HSBC submits the declaration of Lynne Brock, Paluh's cross-trainer in the Adjustments Department, who explains that Paluh was one of three HSBC employees she cross-trained for two weeks each in the Fall of 2001, and that the cross-training she provided to Paluh was not of any lesser quality than the cross-training she provided to the other two employees. Brock Declaration ¶ 4.  Rather, Brock maintains that because she had previously worked with Paluh, she explained the job to Paluh in greater detail as compared to the other two employees.  *Id*.  Brock further explained that although she did permit the first employee she cross-trained, one Laura Lavern ("Lavern"), to actually perform work in

the Adjustments Department, Brock did not do so at the direction of her manager, Palumbo, and, further, when Palumbo learned that Lavern was performing work in the Adjustments Department, Palumbo directed Brock "to stop it immediately and not to allow Ms. Lavern or any other employee being cross trained to perform work in the department." *Id*. ¶ 5.  Brock maintains that cross-training employees were not to perform work in the Adjustments Department because Palumbo was concerned about cross-trainers slowing down production when HSBC was preparing to merge operations with Republic Bank.  *Id*.  Subsequently, Brock did not permit Lavern to perform any more work in the Adjustments Department, nor did she permit the other two employees she cross-trained, including Paluh and one Don Nichols ("Nichols"), to perform any such work.  *Id*. ¶ 6.  According to Brock, neither Lavern nor Nichols was disabled, and Brock denied that Palumbo ever stated she did not want Paluh to work in the Adjustments Department because of his hearing impairment.  *Id*. ¶ 7.

HSBC thus has offered a sufficient, non-discriminatory explanation for the type of cross-training Paluh received in the Adjustments Department so as to shift the burden back to Paluh.  *Chambers*, *supra*, at 37.  Paluh, however, has submitted nothing rebutting  Brock's Declaration, nor otherwise challenged it.[7]  *St. Pierre*, *supra*, at 404.  As such, Paluh has failed to meet his burden of proof so as to defeat summary judgment with regard to his cross-training claim and summary judgment on this aspect of the motion should be GRANTED in favor of HSBC.

---

[7] Significantly, Paluh does not mention whether the January 2002 cross-training received by Wildt, who is also hearing impaired, was also limited to observing.

4.    <u>**Failure to Promote**</u>

Paluh alleges that although he applied for numerous positions through HSBC's internal hiring process, he was not hired or even permitted to interview for any of the jobs because of his disability.  Plaintiff's Affidavit ¶¶ 21-24.  Specifically, Paluh alleges he applied for the following positions: (1) Human Resources Specialist in the Human Resources Department in March 1999; (2) Third Shift MRD Supervisor in April 1999; (3) Item Processing Specialist 1 in Adjustments for which Paluh applied three times, most recently in April 1999; (4) Item Processing Specialist 2 in Adjustments in February 2001; (5) Second Shift MRD Supervisor in Spring 2001; (6) MRD Sections Operations Manager in October 2001; (7) Home Banking Service Specialist in Home Banking in December 2001; and (8) Item Processing Specialist 3 in Adjustments in June 2002.

HSBC argues in support of summary judgment that because Paluh failed to include such claims in his administrative complaints filed with the EEOC, he has failed to exhaust administrative remedies, a precondition to a civil action, and the claims must be dismissed.  Defendant's Memorandum at 11-15.  Alternatively, HSBC argues that some of Paluh's failure to promote claims are barred by the statute of limitations, Defendant's Memorandum at 15-16, and that Paluh cannot establish a *prima facie* claim for employment discrimination based on failure to promote.  Defendant's Memorandum at 16-17.

Paluh, in opposition to summary judgment, does not address HSBC's assertion that Paluh failed to exhaust administrative remedies as to the failure to promote claims.  Rather, Paluh concedes that three of his failure to promote claims should be dismissed as time-barred, including the Human Resources Specialist in the Human Resources

Department for which he applied in March 1999, the Third Shift MRD Supervisor

position for which he applied in April 1999, and the three Item Processing Specialist 1

positions in Adjustments, the most recent one for which Paluh applied in April 1999.

Plaintiff's Response at 13-14.  Paluh also concedes that he was not qualified for the

Home Banking Service Specialist position in the Home Banking Department for which

he applied in December 2001.  Plaintiff's Response at 14.  Paluh further concedes that

there is no record that he ever applied for the Item Processing Specialist 2 position in

the Adjustments Department in February 2001, and that the Item Processing Specialist

3 position in the MRD, for which Paluh applied in June 2002, was closed and never

filled.  Plaintiff's Response at 14.

Paluh, nevertheless, maintains that he has established a *prima facie* case of

employment discrimination based on disability when HSBC failed to promote him to the

Second Shift MRD Supervisor position for which Paluh applied in Spring 2001, as well

as to the MRD Sections Operations Manager position for which Paluh applied in

October 2001.  Plaintiff's Response at 14-17; Plaintiff's Affidavit ¶ 21.  According to

Paluh, although he was qualified for both positions, he was not even invited to interview

for either position and did not even receive a written acknowledgment of receipt of his

application.  Plaintiff's Response at 14-17.  Paluh further maintains that the Human

Resources Department employee responsible for handling job posting applications,

McCain, had previously worked with Paluh in the Proof Department where she was

openly hostile to Paluh because of his hearing impairment.  Plaintiff's Response at 15-

17.  Paluh thus maintains that the record establishes a *prima facie* case of employment

discrimination based on HSBC's failure to promote Paluh to either of these two

positions. *Id*.  In further support of summary judgment, HSBC reiterates that Paluh does not dispute that he failed to exhaust his administrative remedies as to these positions. Defendant's Reply at 7.

Regarding HSBC's assertion that Paluh's claims must be dismissed because he failed to exhaust administrative remedies, the exhaustion of administrative remedies is a prerequisite to a civil action in federal court on a claim under the ADA.  *Curto v. Edmundson*, 392 F.3d 502, 503 (2d Cir. 2004) (citing 28 C.F.R. 42.736(a)).  A plaintiff's failure to exhaust administrative remedies as to an ADA claim renders the district court without jurisdiction over such claims in a civil action in federal court.  *Polera v. Board of Educ. of Newburgh Enlarged City School District*, 288 F.3d 478, 480 (2d Cir. 2002). The Second Circuit has held, in the context of a Title VII claim, that "[a] district court only has jurisdiction to hear Title VII claims that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge."  *Butts v. City of New York Dep't of Housing Preservation & Development*, 990 F.2d 1397, 1401 (2d Cir. 1993) (internal citation omitted).  This requirement also applies to claims brought under the ADA.  *Sotolongo v. New York City Transit Authority*, 63 F.Supp.2d 353, 360 (S.D.N.Y. 1999) ("a plaintiff may litigate [ADA] claims not specifically alleged in an EEOC charge only when the unalleged claims are sufficiently related to the allegations in the charge."), *aff'd*, 216 F.3d 1073 (2d Cir. 2000).

Nevertheless, under *Butts*, there are three kinds of situations where claims not alleged in an EEOC charge are sufficiently related to the allegations in the charge, including: (1) claims where the conduct complained of would fall within the scope of the

EEOC investigation; (2) claims alleging retaliation by an employer against an employee

for filing an EEOC charge; and (3) claims where a plaintiff alleges further incidents of

discrimination carried out in precisely the same manner alleged in the EEOC charge.

*Butts, supra*, at 1402-03.  The rationale behind recognizing as reasonably related

claims in which the conduct complained of would fall within the scope of the EEOC's

investigation "is essentially an allowance of loose pleading . . . [in recognition of the

fact] that EEOC charges frequently are filled out by employees without the benefit of

counsel and that their primary purpose is to alert the EEOC to the discrimination that a

plaintiff claims she is suffering."  *Butts, supra*, at 1402.

Similar to the instant case, in *Butts*, *supra*, the Second Circuit held in the context

of race and sex discrimination claims brought pursuant to Title VII of the Civil Rights Act

of 1964, 42 U.S.C. § 2000e, *et seq.*, that the plaintiff's allegations in the civil action that

she was denied three promotions were not reasonably related to those claims set forth

in the administrative complaint, including an allegation that she was "denied

promotional opportunities and consideration based on my race and sex."  *Butts*, *supra*,

at 1402-03.  The Second Circuit explained that "[w]ere we to permit such vague,

general allegations, quite incapable of inviting a meaningful EEOC response, to define

the scope of the EEOC investigation and thereby predicate subsequent claims in the

federal lawsuit, such allegations would become routine boilerplate and Title VII's

investigatory and mediation goals would be defeated.  *Butts*, *supra*, at 1403 (citing

*Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992)).

Accordingly, because Paluh failed to include his failure to promote claims, *i.e.*,

that HSBC failed to promote Paluh to the Second Shift MRD Supervisor position for

which Paluh applied in the Spring of 2001, or to the MRD Sections Operations Manager

position for which Paluh applied in October 2001, in either of the administrative

complaints filed with the EEOC, he has failed to exhaust such claims and the court is

without jurisdiction over them.  Further, as Paluh does not argue otherwise, he has

conceded as much and HSBC's alternative arguments will not be addressed.  Summary

judgment in favor of HSBC as to Paluh's failure to promote claims should be

GRANTED.


5.      **Denial of Overtime Opportunity**

Paluh claims that he was denied the opportunity to work voluntary overtime in

the MRD, without a supervisor or another employee with "significant experience in the

department" present, because of his hearing impairment.  Plaintiff's Affidavit ¶¶ 13-20.

HSBC argues in support of summary judgment on that the Bank's refusal to permit

Paluh to work unsupervised overtime fails to establish a *prima facie* case for

employment discrimination because MRD's policy prohibited unsupervised overtime

and, alternatively, that Paluh cannot establish that HSBC's reason for disallowing

unsupervised overtime is both false and a pretext for discrimination.  Defendant's

Memorandum at 9-10.

Paluh asserts in opposition to summary judgment that the MRD employees were

advised only that they could stay for voluntary overtime provided "someone in the

department with significant experience stayed instead of the supervisor," Plaintiff's

Response at 11 and n. 2, that the MRD's overtime policy was "relaxed" to permit a

designated person other than the supervisor to stay and supervise employees who

volunteered for overtime after the second shift ended on Fridays, that Paluh was one of the MRD employees with the most experience and other MRD employees had asked if Paluh could be such designated employee, but that Bucholtz, the second shift supervisor, had specifically told Paluh he would not be designated to supervise overtime in Bucholtz's absence because Paluh could not hear the telephone.  Plaintiff's Response at 12-13; Plaintiff's Affidavit ¶¶ 15-16.  Paluh characterizes HSBC's proffered reason for denying Paluh's request for permission to work unsupervised overtime as pretextual on the basis that HSBC contradicted its own asserted policy by permitting the supervisor to designate a "back-up" person to supervise overtime.  *Id*. at 13.

In further support of summary judgment, HSBC emphasizes that Paluh's assertion is limited to the denial of his requests to work overtime following the second shift on Fridays.  According to HSBC, MRD's second shift supervisor Bucholtz averred that she had designated Maria Camacho ("Camacho") as Bucholtz's "back-up" person to supervise overtime in Bucholtz's absence, and that the decision to designate Camacho as the back-up supervisor is in no way related to Paluh's ability to work overtime, which he was regularly permitted to do except on Fridays when neither Bucholtz nor Camacho was also available to supervise.  Defendant's Reply at 4-7; Bucholtz Declaration ¶¶ 5-8.

Initially, Paluh has established a *prima facie* case for employment discrimination based on the denial of his repeated requests for permission to work overtime following the second shift on Fridays, allegedly because of his hearing impairment.  However, HSBC has proffered a legitimate nondiscriminatory explanation for denying such requests which Paluh has failed to rebut, as it his burden.

32

In particular, as HSBC has submitted admissible evidence in support of summary judgment on this issue, Paluh is required to submit admissible evidence to defeat summary judgment. *St. Pierre*, *supra*, at 404. Significantly, although Paluh averred in opposition to summary judgment on this issue that Gilbert advised the second shift MRD employees that they could work overtime on Fridays even if Bucholtz was unable to stay to supervise, "as long as someone with significant experience in the department stayed to ensure that the overtime hours ran smoothly," Paluh Affidavit ¶ 15; *see* Paluh Deposition T. at 120-25, and that "[o]ther members of the [MRD] department looked at [Paluh] and asked if [Paluh] could be the person with experience who stayed for overtime" because the other employees knew Paluh was the one of the MRD employees with "the most experience," Paluh Affidavit ¶ 16; *see* Paluh Deposition T. at 125, Paluh submits nothing corroborating such statements, such as an affidavit from one of the other MRD employees who allegedly asked if Paluh could supervise overtime. Nor has Paluh submitted an affidavit from any MRD employee to corroborate Paluh's assertion that "Ms. Bucholtz told the entire group that [Paluh] could not stay as the 'experienced' employee because [Paluh] is deaf." Paluh Affidavit ¶ 16; *see* Paluh Deposition T. at 125.

Furthermore, Paluh asserts for the first time in opposition to summary judgment that he believes other employees were permitted to work overtime after the second shift ended on Fridays without supervision because on one occasion he observed employees staying after the shift ended, Paluh Affidavit ¶¶ 17-18, however this assertion is not supported by any evidence in the record, such as an affidavit from either a second shift employee who was permitted to work overtime on Fridays without

supervision, or a copy of a time-card or other time-keeping records for any second shift MRD employee indicating the employee worked overtime hours on Fridays without supervision.  Significantly, Paluh does not assert that he was denied access to such information during discovery.  Nor does Paluh dispute Bucholtz's statement, Bucholtz's Declaration ¶ 5, that she designated Camacho to act as her backup until Camacho's termination in July 2002, following which Stephanie Jones was designated as Bucholtz's back-up.  Thus, even if such non-supervised overtime would be probative to establish Bucholtz's discriminatory attitude toward Paluh's hearing impairment, Paluh's failure to show such overtime work occurred is fatal to his claim.

Moreover, Paluh neither names or even describes any of his former co-workers whom Paluh maintains were permitted to work unsupervised overtime when Paluh's requests to do the same were denied.  Paluh's failure to submit anything other than conclusory, self-serving statements in support of his claim of employment discrimination based on the denial of his requests to work unsupervised overtime, particularly after the Friday second shift ended, or to serve as an overtime supervisor during such periods of overtime work, and then to rebut HSBC's evidence in support of summary judgment on this aspect of Paluh's case is fatal to his claim. *Wright*, *supra*, at 137 (to defeat a properly supported motion for summary judgment, "the non-movant must produce specific facts indicating that a genuine factual issue exists.") (underlining added).  Summary judgment should be GRANTED as to this aspect of HSBC's motion.

### 6.     Termination of Employment

HSBC concedes for the purpose of the instant summary judgment motion, that

Paluh has established a *prima facie* case that he was unlawfully terminated based on

his disability, Defendant's Memorandum at 17, yet maintains that Paluh is unable to

show that HSBC's explanation for the termination is both false and a pretext for

discrimination.  *Id*. at 18.  In particular, HSBC maintains that the elimination of Paluh's

MRD position resulted from HSBC's workforce reduction in connection with the transfer

of the bulk of the MRD's responsibilities to India and the implementation of digital

imaging technology.  *Id*.  It is undisputed that two other MRD employees with hearing

impairments, including Stacy Wildt and Elzbieta Kapuscik, were retained, and Paluh

was offered continued employment as an Inserter Operator in the Inserting Services

department.  *Id*.

In opposition to summary judgment, Paluh challenges HSBC's assertion that the

decisions regarding which employees would be let go, and which would be retained,

were based on objective criteria, as "vague."  Plaintiff's Response at 19-21.  According

to Paluh, the fact that HSBC asserts that Paluh "technically" volunteered for termination

by declining the Inserter Operator position cuts against HSBC's assertion that objective

criteria were considered in determining whether to retain Paluh thereby requiring trial.

*Id*. at 20-21.

Paluh further challenges HSBC's assertion that because Paluh turned down the

Inserter Operator position offered prior to his termination, Paluh's termination was

voluntary.  Plaintiff's Response at 21-22.  Specifically, Paluh maintains that after

Nalbach and Kline advised Plaintiff that his MRD employment was scheduled to be

terminated in December 2002, Nalbach informed Paluh of an Inserter Operator position

available in the Inserting Services department which, if Paluh accepted the position,

would be a promotion.  Paluh's Affidavit ¶¶ 25-26.  As Paluh's current position in MRD

was a salary grade 8, Paluh interpreted Nalbach's statement as indicating the Inserter

Operator job would be a salary grade 9 position.  *Id*. ¶ 27.  However, upon visiting the

Inserting Services department and speaking with the department manager, Stafford,

Paluh was told that the only jobs available in the department were salary grade 5 and 6

positions, although supervisor positions were salary grade 7 positions and the

department manager was a salary grade 8 position, but, contrary to Nalbach's

information, no position was a salary grade 9.  *Id*. ¶ 29.  Paluh intended to reject the

offer, but did not wish to lose his right to severance pay, and it was also his

understanding that any employee selected for termination who refuses an offer to work

at another job within the Bank would be denied severance pay.  *Id*. ¶ 30.  Paluh

therefore decided to ask Nalbach to state, in writing, that the Inserter job he had been

offered was a salary grade 9 position, but that Nalbach refused to do so.[8]  *Id*. ¶¶ 30-31.

According to Paluh, had the Inserter Operator position been a promotion, he would

have accepted the job with the intention of later applying to transfer to another

department.  *Id*. ¶ 31.  Because Nalbach refused to provide Paluh with a written

statement confirming that the salary grade of the Inserter Operator position was 9,

Paluh considered the job offer as "a trap to either have [Paluh] demoted or to lose [his]

severance pay if [he] refused."  *Id*. ¶ 32.

---

[8] Paluh, in objecting to Defendant's Fact Statement, asserts that the mere fact that HSBC decided that Paluh was eligible for severance benefits establishes that the Inserter Operator position offered to Paluh was below salary grade 8.  Plaintiff's Fact Statement ¶ 14.

According to HSBC, regardless of whether the decision to terminate Paluh's employment was based on objective criteria is irrelevant to the determination of whether its proffered reason for terminating Paluh is merely a pretext to conceal discrimination as the absence of "objective criteria" in determining whether to terminate an employee does not demonstrate discriminatory intent.  Defendant's Reply at 8 (citing *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 990-91 (1988)).  HSBC further argues that Paluh's rejection of the Inserter Operator position is irrelevant to whether HSBC's termination of Paluh's MRD position was discriminatory.  *Id*. at 8-9.

With regard to Paluh's argument, Plaintiff's Response at 19-21, that it is "impossible" to ascertain how Paluh "measured up to the performance of others because no criteria were ever quantified in making the ultimate decision" as to which MRD employees would be retained, courts within the Second Circuit have held that the absence of objective criteria alone is insufficient to render an adverse employment decision discriminatory.  *See Woroski v. Nashua Corp.*, 31 F.3d 105, 109 (2d Cir. 1994) (termination of plaintiff permissible because of "business-justified company-wide reduction in force, conducted on an unbiased basis.").  In *Woroski*, *supra*, the plaintiffs challenged the termination of their employment under the Age Discrimination in Employment Act ("the ADEA"), arguing they had been dismissed not in connection with a business-related downsizing affecting the entire company, as the employer maintained, but, rather, based on their advanced age. *Woroski*, *supra*, at 108-09.  Then Second Circuit, in affirming summary judgment granted by the district court in favor of the employer, observed that there was some evidence of age bias, particularly in the form of conclusory statements by one of the plaintiffs, but such evidence was

insufficient withstand summary judgment, particularly given that the employer had demonstrated that a legitimate business-motivated downsizing was necessary and that other employees of similar ages and even older were not terminated.  *Id*.

Similarly, in the instant case, HSBC has articulated a legitimate business-motivated reason for the reduction of workforce in the MRD.  In particular, the transfer of the bulk of the MRD work to India and the implementation of digital-imaging technology both resulted in a substantial reduction in the amount of work previously performed in the MRD.  Furthermore, although Paluh, who is admittedly hearing impaired, was one of the employees who were not retained, two other hearing impaired employees, including Wildt and Kapuscik, were retained.  Additionally, Paluh acknowledged during his deposition that in his opinion Kapuscik's hearing is more impaired than his own.  *See* Paluh Deposition T.[9] at 261 (responding to deposition inquiries as to whether Paluh knew Kapuscik and that Kapuscik is hearing impaired: "She's more deaf than me.  She's profound deaf.  She can't hear anything.  Not even a hearing aid helps.").

Moreover, "although an employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision," the Second Circuit has observed with regard to employment discrimination actions that district courts must respect an employer's personnel decisions, including the employer's "unfettered discretion" to choose among qualified employees; the court's role is limited to preventing unlawful employment practices,

---

[9] Defendant's Exhibit R.

rather than acting as a "'super personnel department' that second guesses employers' business judgments." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) (quoting and citing *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)).  In other words, "[e]mployers are not required to make wise employment decisions, they are merely prohibited from making discriminatory ones." *Bagdasariajn v. O'Neill*, 2002 WL 1628722, * 4 (W.D.N.Y. July 17, 2002) (citing cases). Furthermore, where a plaintiff seeks to avoid summary judgment in an employment discrimination action "on the strength of a discrepancy in qualifications ignored by an employer . . . the plaintiff's credentials would have to be so superior to the credentials of the person selected . . . that no reasonable person, in the exercise of impartial judgment," would have made the same employment decision as the employer. *Byrnie*, *supra*, at 103.  Here, the record establishes that although Paluh was qualified for the Item Processing Specialist 1 job, he was, nevertheless chosen for termination because Nablach and Kline believed that other MRD employees who were so selected for termination had more to offer the bank.  Paluh offers no evidence implying these choices were unreasonable.

As to Paluh's assertion, Plaintiff's Response at 22, that HSBC's characterization of Paluh as "technically" volunteering for termination by declining the Inserter Operator position cuts against HSBC's assertion that objective criteria were considered in determining whether to retain Paluh, a fair reading of the record establishes that HSBC initially decided, based on a review of the objective criteria, to terminate Paluh from the MRD, but that Paluh had the opportunity to continue within the Bank's employ, albeit in the Inserter Services department as an Inserter Operator, and that Paluh, upon

declining the Inserter Operator position, voluntarily terminated his employment with

HSBC.  As such, HSBC's characterization of Paluh's termination from the Bank as

"voluntary" is not inconsistent with HSBC's assertion that the decision not to retain

Paluh within the MRD department was based on an assessment of objective criteria.

Nor is there any merit to Paluh's assertion, Plaintiff's Response at 21-22, that

HSBC discriminated against him based on his hearing impairment by forcing Paluh into

the unenviable position of having to decide between either accepting the Inserter

Operator job at a salary significantly less than what Paluh earned as an Item

Processing Specialist 1 Position in the MRD, or declining the offer which would render

Paluh ineligible for severance benefits.  It is undisputed that following the termination of

Paluh's employment at HSBC, Paluh received severance pay of $ 6,000, as well as

unemployment insurance benefits totaling more than $ 14,000 over 39 weeks.  As such,

Paluh's receipt of severance benefits because the Inserter Operator position which

Paluh had rejected would have been paid at a lower level that his Item Processing

Specialist 1 position, would belie Gilbert's alleged assertion to Paluh that such position

either would pay the same salary as Paluh's Item Processing Specialist position, or be

a promotion.  Nevertheless, even a material question of fact as to how Gilbert

represented the Inserter Operator position to Paluh would not foreclose summary

judgment.  *See St. Mary's Honor Center*, *supra*, at 520-22 (holding even if employer's

proffered legitimate and nondiscriminatory reason for challenged adverse employment

action is disbelieved by finder of fact, summary judgment may still be granted in

employer's favor in the absence of some evidence of an unlawful reason for the

challenged employment action).  As discussed, Paluh fails to point to anything in the

record demonstrating he was terminated for any reason other than the Bank's decision

to out-source the work of the MRD and the implementation of digital imaging

technology.  *Wright*, *supra*, at 137.

As such, summary judgment in favor of HSBC should be GRANTED as to this

aspect of the motion.


7.   **Retaliation**

Paluh claims that HSBC retaliated against him for filing the initial EEOC

complaint on July 3, 2001, by terminating Paluh's employment on December 18, 2002.

Amended Complaint ¶ 20.  HSBC argues in support of summary judgment that Paluh

cannot establish a *prima facie* case for his retaliation claim as Paluh cannot establish

the requisite causal connection between the protected activity in which Paluh

participated and the termination of his employment given the 13 month lapse of time

between the two events.  Defendant's Memorandum at 19-20.  Alternatively, HSBC

asserts that it's decision to terminate Paluh's employment was both legitimate and

nondiscriminatory and the fact that Wildt, another hearing impaired employee who also

filed an EEOC complaint alleging employment discretion based on disability, was

retained.  Defendant's Memorandum at 20.

Paluh, in opposition to summary judgment, concedes that HSBC's decision in

August 2002 to terminate his employment is too remote from the filing of his initial

EEOC Administrative Complaint on July 3, 2001 to establish the requisite causal

connection.  Paluh's Response at 24.  Nevertheless, Paluh maintains that his retaliation

claim is supported by the other adverse employment actions to which he was subjected,

including the continued failure to cross-train Paluh and permit him to work unsupervised overtime and to promote him.  Paluh's Response at 24-25.   HSBC argues in further support of summary judgment that such assertions are an improper attempt to assert a new claim for the first time in opposition to summary judgment.  Defendant's Reply at 9.

The same framework used to analyze retaliation claims under Title VII claims is used to analyze retaliation claims under the ADA.  *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999).  In particular, "[t]o establish a *prima facie* case of retaliation under the ADA, a plaintiff must establish that (1) the employee was engaged in activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the employee occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." *Sarno*, *supra*, at 159 (citing cases).  In the instant case, HSBC concedes for the purpose of this motion, that Paluh has met the first three elements to establish a *prima facie* case of retaliation, Defendant's Memorandum at 19, whereas Paluh has not disputed HSBC's contention that he has conceded that he is unable to establish the fourth element, *i.e.*, a causal connection between the filing of the first EEOC administrative complaint on July 3, 2001, and HSBC's decision in August 2002 to terminate his employment.  Plaintiff's Response at 24.

The courts have held that it is inappropriate to raise new claims for the first time in submission in opposition to summary judgment.  *Beckman v. U.S. Postal Service*, 79 F.Supp.2d 394, 407 (S.D.N.Y. 2000) (raising new claim for first time in submission in opposition to summary judgment is inappropriate); *Caribbean Wholesale & Serv. Corp. v. U.S. JVC Corp.*, 963 F.Supp. 1342, 1359 (S.D.N.Y. 1997) ("[Plaintiff] in effect is

apparently attempting to add a claim never addressed, or even hinted at, in the complaint.  Such a step is inappropriate at the summary judgment stage, after the close of discovery, without the Court's leave, and in a brief in opposition to a motion."). Accordingly, Paluh's assertion, raised for the first time in opposition to summary judgment, that HSBC retaliated against him not only by terminating his employment, but also by continuing to deny him the opportunity to cross-train and to work overtime, as well as by failing to promote Paluh, after the close of discovery on November 3, 2003 (April 2, 2003 Scheduling Order, Doc. No. 8), is a belated and improper attempt to amend the pleadings without filing an appropriate motion for leave to do so.  As such, it is insufficient to defeat summary judgment on Paluh's retaliation claim.

Summary judgment on Paluh's retaliation claim should be GRANTED in favor of HSBC.


## 8.   Duty to Mitigate Damages

As the undersigned is recommending granting HSBC's summary judgment motion and dismissing all claims in their entirety, the court need not address HSBC's alternative request for summary judgment on Paluh's request for back and front pay and benefits because Paluh failed to mitigate damages as HSBC contends. Nevertheless, as the matter is before the court for a report and recommendation, the court addresses HSBC's alternative request for relief in the event Judge Arcara disagrees with the primary recommendation.

HSBC urges the court to dismiss Paluh's claims for front and back pay and benefits because Paluh, upon being terminated from the Bank, failed to mitigate

damages by seeking alternative employment, choosing instead to enroll in school.
Defendant's Memorandum at 20-21.  Paluh argues in opposition that although a victim
of employment discrimination has a duty to mitigate damages, there are limits on such
duty, including that the plaintiff need not take a job in a different line of work, accept a
demotion or take a demeaning position.  Plaintiff's Response at 25.  Paluh further
asserts that whether he made a reasonably diligent effort to obtain suitable, alternative
employment so as to be entitled to back and front pay and benefits is a factual question
reserved for the jury.  *Id*.  According to Paluh, his decision to abandon his job search
and return to school was predicated on advice received from New York State's
Vocational and Educational Services for Individuals with Disabilities ("VESID"), which
serves as an employment agency for individuals with disabilities.  *Id*. at 25-26.  HSBC
asserts in further support of summary judgment that reliance on advice from VESID is
insufficient to excuse Paluh from his obligation to use reasonable efforts to seek work.
Defendant's Reply at 9-10.

   "Victims of employment discrimination are required to mitigate their damages."
*Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 53 (2d Cir. 1998).  As such, discharged
employees are required to "'use reasonable diligence in finding other suitable
employment,' which need not be comparable to their previous positions."  *Greenway*,
*supra*, at 53 (quoting *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231032 & n. 15 (1982)).
Although traditionally it has been the employer's burden to demonstrate the existence
of suitable alternative work in the marketplace which the former employer made no
reasonable effort to find, the Second Circuit has held that the employer is relieved of
such burden if the employer "can prove that the employee made no reasonable efforts

to seek such employment." *Greenway*, *supra*, at 53-54 (citing *Weaver v. Casa*, 922 F.2d 1515, 1527 (11th Cir. 1991)).  Furthermore, a plaintiff who opts to attend school instead of searching for and returning to work generally does not fulfill his obligation to mitigate damages unless the decision to return to school full-time occurs after an unsuccessful job search.  *Greenway*, *supra*, at 54 (citing cases).  *See also Dailey v. Societe Generale*, 108 F.3d 451, 456 (2d Cir. 1998) (stating fact finder may conclude that the decision to attend school full-time "only when diligent efforts to find work prove fruitless," satisfied the duty to mitigate damages).

Significantly, Paluh does not maintain that he undertook any job search, diligent or otherwise, upon being terminated from HSBC and before deciding to return to school.  Under these circumstances, no reasonable trier of fact could find that Paluh's decision to return to school was made only after a diligent, yet fruitless, job search.  As such, summary judgment as to this claim should be GRANTED in HSBC's favor.

## **CONCLUSION**

Based on the following, Defendant's motion for summary judgment (Doc. No. 19) should be GRANTED and the Clerk of the Court should be directed to close the file; alternatively, Defendant's request seeking dismissal of Plaintiff's claims for back and front pay and benefits should be GRANTED.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:       June 30, 2005
             Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:     June 30, 2005
           Buffalo, New York